**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-247 (JDB)** |
| **BRADLEY WAYNE WEEKS** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Bradley Wayne Weeks to 27 months' imprisonment, in the middle of the applicable sentencing range, 3 years' supervised release, $2,000 in restitution, and mandatory special assessments as to each count totaling $170.

### I.    INTRODUCTION

The defendant, Bradley Weeks, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1]    As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary

Weeks wrote of his intention to bring firearms to Washington, D.C to attend a "protest/revolution."   He planned not only to go to the rally but also march to the Capitol building "to show these Congressmen who runs America."   Once at the Capitol, he watched as members of the crowd attacked law enforcement who were trying to repel them from the building using tear gas.   He climbed a wall, encouraged other rioters to follow him by waiving them towards the building, then climbed an overturned bike rack barrier to get onto the stairs leading to the Upper West Terrace of the building.

He declared his intent in a video-recorded speech on the Upper West Terrace near the Senate Wing Door:   "We've reached the steps.   We've had to climb scaffolding.   We've had to climb ladders.   We've had to break things to get through, but we've gotten through. We've gotten through, and we are taking back the Capitol! We're taking back our country! This is our 1776! This is where it's gonna happen! This is where Tyranny will fall! This is where America will rise! Look at this, America! Look at this!"   Weeks then turned the camera towards the lawn where rioters were overwhelming police and barricades to storm the Capitol.

After entering the Capitol building through the Senate Wing Door, Weeks spent approximately 20 minutes inside, walking the length of the building, making phone calls, taking videos and photos, and texting his mother, "Our country is dying."

The government recommends that the Court sentence Weeks to 27 months' incarceration, the midpoint the advisory Guidelines' range of 24-30 months.   Such a sentence reflects the gravity of Weeks' conduct, his complete lack of remorse, and the overwhelming need for deterrence.

---

($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.     FACTUAL BACKGROUND

### A.      The January 6, 2021, Attack on the Capitol

The government refers the Court to Trial Exhibits 8.01, 8.02, and 6.07[2] for an overview of the January 6, 2021, attack on the United States Capitol in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.

### B.      Weeks's Role in the January 6, 2021, Attack on the Capitol

Weeks—along with his co-defendant, Danny Carlton—was among a group of rioters who illegally entered the U.S. Capitol grounds and then entered the U.S. Capitol building itself.

Prior to January 6, 2021, Weeks started a "Stop the Steal" Facebook group, which Weeks claimed included 15,000 "patriots who are fed up". Ex. 1.05.     Weeks also subscribed to a service called "Stop The Steal – JAN6," which distributed mass texts to subscribers about efforts to obstruct the certification of the election in Washington, D.C., on January 6.   Ex. 1.06.     As early as December 23, 2020, Weeks announced he was going to Washington, D.C., and anticipated that if Trump was not kept in power, he and others would "burn the whole f*cking thing down":



*Ex. 1.09*

---

2       The government will make trial exhibits available to the Court ahead of sentencing.

As Judge Hogan found at trial, further evidence of Weeks's corrupt intent to obstruct the Joint Session of Congress came from his January 4, 2021, photograph of two long guns and several boxes of ammunition stacked on top of a bed, accompanied by the claim, "We will be packing."   Trial Tr. at .[3]



*Ex. 1.11*

Another indication that Weeks brought weapons to Washington, D.C. was his January 5, 2021, WhatsApp exchange with his wife, while driving to Washington, D.C.   In the exchange, Weeks's wife advised him that certain medication could be found in the inside zipper of one of his bags, on the same side "where the shotgun shells are."   Ex. 1.14.

On the morning of January 6, Weeks messaged his wife about his plans to use the Metro to go to the rally, but stated that he would be returning from the Capitol building.   Ex. 1.15. Weeks and Carlton attended the "Stop the Steal" rally at the Ellipse, then marched to the Capitol

---

[3]   The transcript of Judge Hogan's verdicts and findings of fact is attached as an exhibit to this memorandum.

Building as planned.   As they moved towards the Capitol grounds, Weeks filmed a video of the crowd and stated, "We are marching to the Capitol building, Ladies and Gentleman, to show these Congressmen who runs America."   Ex. 1.32.

Weeks and Carlton arrived on Capitol grounds just before 2:00 p.m.   Ex. 2.01.   From their position amongst a large group of rioters on the northwest lawn of the Capitol, they observed a crowd that had been violently attacking officers of both the U.S. Capitol Police and the Metropolitan Police Department, climbing the walls of the Capitol, and purloining bike rack barriers to use as ladders.   Exs. 2.01, 2.02, 3.01, 4.07, 4.10, 4.13, 1.34, 1.35, and 1.37.

Around this time, police officers deployed tear gas cannisters in an effort to disperse their attackers.   Ex. 301.   Referring to one of those cannisters, some of the rioters responded by shouting, "Pick it up and throw it!" and "Throw it back at the Capitol!" which one of them did. *Id.*   Rather than leave the area, Weeks advanced, climbing a retaining wall and then ascending a bike rack barrier onto a balustrade near the Northwest Stairs.   Exs. 2.02, 4.10, and 4.13.   While on the retaining wall, Weeks encouraged other rioters to follow his advance on the Capitol, making excited gestures towards the Capitol building, including a "follow me" gesture with his arm.   Ex. 4.10 at 00:23-00:24, Ex. 4.13 at 00:03-00:05 and 00:47-00:50.

Weeks climbed the Northwest Stairs towards the Upper West Terrace of the Capitol.   Ex. 2.03 and 2.04.   While on the stairs, Weeks sent a voice message to his wife at 2:14 p.m. saying, "breached the Capitol. I'm going in, we're going in."   Ex. 1.38.   Upon reaching the Upper West Terrace, Weeks took video of the expansive crowd of rioters on the northwest lawn as well as the bike rack barriers, police tape, and an AREA CLOSED sign at the top of the steps he had just climbed.   Ex. 1.39.

Near the top of the stairs, Weeks launched into a speech describing his actions and admitting that his goal was to interfere with Congress:

> We've reached the steps.  We've had to climb scaffolding.  We've had to climb ladders.  We've had to break things to get through, but we've gotten through. We've gotten through, and we are taking back the Capitol! We're taking back our country! This is our 1776! This is where it's gonna happen! This is where Tyranny will fall! This is where America will rise! Look at this, America! Look at this!

Ex. 1.40.   Weeks recorded his tirade in a "selfie" video, switching to a front-facing camera at the end and displaying the crowds of rioters below on the Capitol lawn.   Weeks later posted the video to social media.

While on the Upper West Terrace, Weeks bragged to a friend that, "We've breached the capital…" and "Were busting the doors down now."



*Ex. 1.45*

Weeks and Carlton walked together towards the Senate Wing Door, which, together with its adjacent windows, had been breached by the mob around 2:13 p.m.   Ex. 2.05.   Around 2:27 p.m., the Capitol Police briefly regained control of the door and barricaded it with furniture from the inside.   Ex. 2.23.   Weeks and Carlton separated again, with Weeks remaining outside on the

6

Terrace (Exs. 2.05, 1.52, and 1.63) and Carlton joining the line of rioters who broke through the improvised barricade and violently forced their way into the building (Ex. 2.23).

Carlton texted Weeks at 3:04 p.m. that he was inside the Capitol building.   Despite receiving a text from Carlton telling Weeks to stay outside, Weeks texted Carlton stating that he was inside the building.



*Ex. 1.69*

Weeks entered the Capitol building through the Senate Wing door at 3:08 p.m.



*Ex. 2.07A*

Weeks reunited with Carlton near the Senate Wing Door at approximately 3:09 p.m.   Instead of leaving the Capitol through the door that they had just entered—which was still within view—Carlton and Weeks turned and moved further into the building.



*Screenshot of Ex. 2.07 – Weeks circled in red; Carlton indicated by yellow arrow*

Weeks and Carlton walked to the Crypt where Weeks joined a crowd of rioters chanting, "USA! USA!"



*Ex. 4.17.*

Weeks and Carlton continued south, crossing the length of the first floor of the Capitol, eventually reaching the Hall of Columns on the south side of the Capitol.

9



*Ex. 2.13A*

After reaching the Hall of Columns and seeing the police officers there dealing with other rioters, Carlton and Weeks turned back and retraced their steps through the Capitol.

While Weeks was still inside the Capitol building, he received a text message from his mother expressing concern that his grandmother would die over his actions.   Weeks responded, "Our country is dying."



*Ex. 1.77.*

Weeks and Carlton exited through the Senate Wing Door at around 3:29 p.m.



*Ex. 2.14A*

Weeks spent roughly 20 minutes inside the Capitol.   After exiting the building, Weeks and

Carlton lingered on the Upper West Terrace outside the Capitol until at least 3:52 p.m., where they

posed, grinning, with the Capitol dome and MPD riot officers in the background.



*Ex. 1.78*

Weeks also took a photo of graffiti on the exterior wall of the Capitol building, which read, "OUR HOUSE!"



Ex. 1.83

## III.    PROCEDURAL BACKGROUND

On March 24, 2021, Weeks was charged by Indictment with obstruction of an official proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count One); entering and remaining in a restricted building or ground, in violation of 18 U.S.C. § 1752(a)(1) (Count Two); disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Three); disorderly conduct in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count

Four); and parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Five).   ECF No. 17.

Trial commenced on December 8, 2022.   The government called three witnesses and presented evidence consistent with the summary of factual background provided above.

On December 9, 2022, Judge Hogan, sitting as trier of fact, found the defendant guilty on all five counts and orally gave his verdict and findings of fact.   Trial Tr. at 89.   Judge Hogan found that Weeks's "whole approach … was to overthrow the operations of the government according to the Constitution on the Electoral College vote count," adding, "I can't find anything else from his activities and his statements, his own statements."   *Id.* at 76.   Judge Hogan rejected Weeks's argument that he could not have obstructed the Electoral College vote because the proceedings had been suspended by the time Weeks entered the building.   *Id.* at 66.   Rather, Weeks and other rioters disrupted Congress as long as they remained inside building.   *Id.*

Judge Hogan found Weeks's reference to "packing" and the fact that he clearly packed ammunition, regardless of whether he brought guns to the Capitol,[4] to be significant indicators of Weeks's intent "to do about whatever he had to do to overcome the electoral process."   *Id.* at 77-78.

Judge Hogan found that Weeks knowingly encouraged others:

[Weeks was] aware of the natural and probable consequences of his conduct that he intended to obstruct or impede the proceeding, which he did by encouraging the rioters when he was there with the waving of his arms, with his own actions, climbing up this ladder they made out of the bike racks, which are supposed to be obstructions so they wouldn't go in there.

*Id.* at 78.

---

[4]   The government presented no evidence that Weeks was armed at the Capitol.

Judge Hogan found that Weeks's own actions— climbing the scaffolding like a ladder and going past 1-2 fences to get there (*see* Ex. 4.13, below)—also showed Weeks' corrupt intent. Trial Tr. at 78.



*Ex. 4.13.*

Judge Hogan found that Weeks's corrupt intent was further shown by his text exchange with his mother, in which she warned him not to do anything rash and said his grandmother would die, and Weeks responded, "Our country is dying."   The Court said: "In other words, he was continuing with his efforts.   It didn't faze him, whatever warnings his mother gave him or concern. He was more upset that he thought the country was being lost, so he continued with his activities." Trial Tr. at 75.   "[Weeks] certainly had a consciousness of wrongdoing.   I mean, his mother told him to stay out of trouble, and others, and he continued on his purpose, which at that point had become an unlawful purpose."   *Id.* at 79.

14

On December 22, 2022, Weeks filed a Motion for New Trial, reiterating arguments that were rejected in Weeks's pretrial motion to dismiss, and arguing that there was insufficient evidence of Weeks's corrupt intent and that the court erred in admitting the government's riot overview montage exhibit.   Judge Hogan denied Weeks's post-trial motion on January 26, 2023. After the hearing, the case was reassigned for sentencing to this Court.

## IV.    STATUTORY PENALTIES

Weeks now faces sentencing on Count One: Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2; Count Two: Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); Count Three: Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); Count Four: Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and Count Five: Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

As noted by the Presentence Report issued by the U.S. Probation Office, on Count One, the defendant faces up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.   With respect to Counts Two and Three, the defendant faces up to one year of imprisonment, a term of supervised release of not more than one year, up to five years' probation, a $100,000 maximum fine, and a mandatory special assessment of $25.   With respect to Counts Four and Five, the defendant faces up six months' imprisonment, up to five years' probation, a $5,000 maximum fine, and a mandatory special assessment of $10.

## V.        THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."   *United States v. Gall*, 552 U.S. 38, 49 (2007).   The Guidelines analysis for Counts 1-3[5] is as follows:[6]

Count One: 18 U.S.C. § 1512(c)(2)

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference[7] | +3 |
| | **Total** | **17** |

Count Two: 18 U.S.C. § 1752(a)(1)

| | | |
|---|---|---|
| U.S.S.G. §2B2.3(a) | Base Offense Level | 14 |
| U.S.S.G. §2B2.3(b)(1)(A)(vii) | Restricted Building/Grounds | +2 |
| U.S.S.G. §2B2.3(c)(1) | Cross Reference | |
| U.S.S.G. §2X1.1(a) | Adjusted Base Offense Level | 17 |
| | **Total** | **17** |

---

[5]        Counts 4 and 5 are Class B misdemeanors to which the Sentencing Guidelines do not apply.

[6]        The government agrees with the Total Offense Level and Guidelines Range reached by the PSR.   However, the government maintains that the Guidelines require the Court to first calculate the offense level of each count of conviction, then group the counts.   Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count."   Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3.   The government therefore sets forth the offense level calculation for each count to which the Sentencing Guidelines apply.

[7]        The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources."   *See* U.S.S.G. §2J1.2(b)(2), Application Note 1.   Judge Hogan found beyond a reasonable doubt that Weeks corruptly obstructed and impeded an official proceeding, namely the certification of the Electoral College vote count.   The riot resulted in evacuations, vote count delays, officer injuries, and more than 2.9 million dollars in losses.   As described herein, law enforcement from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters.   This Court applied the enhancement under U.S.S.G. §2J1.2(b)(2) in *United States v. Brock*, 21-cr-140.

<u>Count Three: 18 U.S.C. § 1752(a)(2)</u>

| | | |
|---|---|---|
| U.S.S.G. §2A2.4(a) | Base Offense Level | <u>10</u> |
| | **Total** | **10** |

<u>Grouping:</u>

Under U.S.S.G. §3D1.2(a) and (c), "closely related counts" group.   Counts One, Two, and Three comprise a single group under U.S.S.G. §3D1.2(a) and (b) because the victim of each count is Congress.   Under U.S.S.G. §3D1.3(a), the offense level for a group of closely related counts is based on the highest offense level of the counts in the group.

The highest offense level is 17 (for Count One); therefore, the combined offense level for the group of Counts One, Two, and Three is 17.

**Total Offense Level:**                                                                 **17**

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed.   PSR ¶ 53.   Accordingly, based on the government's calculation of the defendant's total offense level, Weeks's Guidelines imprisonment range is 24 to 30 months' imprisonment.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a).   As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Bradley Weeks's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a constitutional crisis.   Weeks actively participated in and encouraged others to participate in the riot as they overwhelmed law enforcement and climbed walls to gain

access to the building.   He gave a speech on the threshold of the Capitol building calling for revolution and texted that "We've breached the capital I've already been sprayed" and "Were busting the doors down now."   He also joined the rioters chanting in the Crypt while inside the building.   The nature and circumstances of Weeks's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 27 months' incarceration.

### B.  The History and Characteristics of the Defendant

The defendant does not have a history of criminal convictions aside from some minor traffic violations.   Though he reports regular employment since 2000 (PSR ¶¶ 87-90), Weeks has not filed any personal or business tax returns for "an unspecified amount of time" (PSR ¶ 104).

There is nothing in Weeks's background, such as a difficult upbringing, which might mitigate his decision to engage in criminal actions on January 6, 2021.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration.   Weeks's criminal conduct on January 6 was the epitome of disrespect for the law and the functioning of our democracy.

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B).   The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[8]   The demands of general

---

[8]      *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### Specific Deterrence

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.   Although the defendant has a criminal history category of I, his statements while planning and during this event indicate he intended to participate in a violent attack on our democratic processes.   The defendant has not expressed remorse for his actions.   To the contrary, he posted on GiveSendGo, "My name is Brad Weeks and I was charged with a felony and 4 misdemeanors for my involvement on January 6th. We recently had the trial after almost a 2 year lengthy battle and I was convicted on all 5 charges. Even though I didn't fight with any police officers, didn't break or vandalize anything and the only reason I made a quick trip inside the capital was to retrieve my hurt friend who was trampled and we quickly exited.[9]   We've had to sell our home and have already paid a large sum in legal fees. I really want to appeal this decision and feel I was unjustly charged but need financial assistance to carry this forward. I'm married, have two children, two stepchildren and a grandchild on the way. I'm the main provider of our house and as you can imagine this has put a huge financial strain on all of us. Anything that you can find in your heart to help our cause will be greatly appreciated, thanks and God bless." (https://www.givesendgo.com/BradWeeks_J6, last accessed July 18, 2023).

---

[9]      As discussed above, this claim is belied by overwhelming evidence.   Weeks and Carlton did not quickly exit—they marched from one end of the building to the other, canting and gawking at police and other rioters.   Though the defense argued at trial that Weeks entered the building merely to help his friend, the defense put on no evidence in support that claim.   Moreover, it was flatly contradicted by the government's evidence and the court clearly did not find it persuasive.

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007).   As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'"   *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up).   Accordingly, courts must give "respectful consideration to the Guidelines."   *Id.* at 101.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges."   *Gall v. United States*, 552 U.S. 38, 54 (2007).   In short, "the Sentencing Guidelines are themselves an anti-disparity formula."   *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021).   Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.   *See United States v.*

*Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).   After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge."   *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).   The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender."   *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).   "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant."   *Id*. at 1095.   "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances."   *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[10]

---

[10]    If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases in which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly."   *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009).   *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[11]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In the case of Larry Brock, 21-cr-140, this Court sentenced the defendant to 24 months' incarceration.   Like Weeks, Brock engaged aggressively with social media ahead of the riot, making clear his intent to interfere with Congress and his preparation for a fight.   Brock ascended the Northwest Stairs at approximately the same time as Weeks, climbing over scaffolding and clamoring through the crowd to get up to the Upper West Terrace, similar to Weeks.   Brock spent more time than Weeks inside the Capitol and made it onto the Senate floor.   The government requested 60 months' incarceration.   However, this Court calculated the same Sentencing Guidelines range as applies to Weeks, having determined that an additional enhancement (not sought by the government here) did not apply in Brock's case.   Like Brock, Weeks does not

---

[11]      A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

benefit from a downward adjustment for acceptance of responsibility because both defendants were convicted at trial.

Tommy Allan, 21-cr-64 (CKK), faced a Sentencing Guidelines range of 21-27 months after pleading guilty to violating 18 U.S.C. § 1512(c)(2).   Like Weeks, Allan's social media before riot reflected that he was angry about the 2020 election and wanted to "fight".   After the "Stop the Steal" rally near the White House, Allan returned to his hotel room, but when he saw on television that rioters had broken through barricades at the Capitol, Allan left his hotel and went to join in the riot.   Allan went onto the Senate floor and stole papers from the Senators' desks.   After the riot, Allan bragged about the riot and having stolen the papers on Facebook Live.   Shortly thereafter, Allan deleted his Facebook burned the stolen papers, and got rid of his cellphone. Allan did not engage in any violence while inside the Capitol or on the grounds.   At his sentencing, Judge Kollar-Kotelly appreciated Allan's apology to the country and credited his expression of genuine remorse.   Allan was subject to an additional two levels under U.S.S.G. §3C1.1 for obstruction but benefited from a three-level reduction for acceptance of responsibility. Judge Kollar-Kotelly sentenced Allan to 21 months' incarceration.

James Rahm, 12-cr-150 (TFH), pleaded guilty to one count of violating 18 U.S.C. § 1512(c)(2).   During the riot, Rahm, posted on Facebook, "They're in there counting the electoral votes we have the building surrounded we're ready to make a breach and take our Capitol back." He then entered the Capitol through the East Rotunda Doors after rioters on the inside shoved police out of the way and opened the doors for Rahm and the cohort on the portico.   Once inside, Rahm recorded himself stating, "Time to find some brass and kick some friggin' ass."   Rahm celebrated halting the certification of the 2020 Electoral College vote count.   Rahm benefitted from a downward adjustment for acceptance of responsibility, resulting in a Guidelines range of

15-21 months.   The government recommended 15 months' incarceration.   Judge Hogan further varied downward due to the defendant's significant health issues and sentenced the defendant to 12 months.

Finally, Hatchet Speed, 21-cr-244 (TNM), also faced sentencing on a conviction under 18 U.S.C. § 1512(c)(2), and the same misdemeanors of which Weeks was convicted, following a bench trial.   Speed, like Weeks, was undeterred by obvious signs of conflict between the police defending the Capitol and the rioters forcing their way in.   Speed was aware of the precise details of the proceeding underway and its role in transfer of presidential power.   As Speed later told an FBI undercover employee, there was "nothing the cops [could] do… it's impressive."   Speed hoped the mob's resistance would spark a larger uprising that would so intimidate Congress that then Speaker Nancy Pelosi to would "resign out of fear for her life."   Speed remained inside the Capitol for over 40 minutes, leaving only because he believed that then-Speaker Pelosi had done what he wanted: postponed the certification of the electoral college vote.   The government recommended 48 months' incarceration, which Judge McFadden imposed.   Though Judge McFadden disagreed with the legal application of enhancements for substantial interference and threats of violence to interfere with the administration of justice, he agreed that they were factually warranted, and therefore varied upward in the sentence he imposed.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case.   Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).   First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291

24

§ 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But Weeks was convicted of a violation of an offense under Title 18; the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)).   The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[12]

Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to:  (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses, 18 U.S.C. § 3664(h).   That latter approach is appropriate here.

More specifically, the Court should require Weeks to pay $2,000 in restitution for his convictions on Counts One through Five.   This amount fairly reflects Weeks's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property.   Accordingly, such a restitution order avoids sentencing disparity.

---

[12]     Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 27 months' incarceration, three years' supervised release, $2000 in restitution, and mandatory special assessments totaling $170.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:      _____/s/_____
Jamie Carter
D.C. Bar 1027970
Assistant United States Attorney
Office of the United States Attorney
for the District of Columbia
601 D Street, N.W., Room 4.210
Washington, D.C. 20530
Jamie.Carter@usdoj.gov
202-252-6741

_____/s/_____
Kathryn E. Fifield
Wis. Bar No. 1097640
Trial Attorney
U.S. Department of Justice, Criminal Division
1301 New York Avenue NW, Suite 1000
Washington, DC 20530
(202) 320-0048
Kathryn.fifield@usdoj.gov