## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA,**

**v.**                                              **Case No.: 1:21-cr-00024-JDB-1**

**BRADLEY WAYNE WEEKS,**

   **Defendant.**

_____

### DEFENDANT'S SENTENCING MEMORANDUM

Defendant, Bradley Wayne Weeks, by and through undersigned counsel and pursuant to 18 U.S.C. §3553(a), hereby provides this Court with his Sentencing Memorandum in anticipation of his sentencing scheduled for August 16, 2023.

### I.   Statement of Offenses

Bradley Weeks is before the Court for sentencing following a bench trial where he was convicted of Obstruction of an Official Proceeding, in violation of 18 U.S.C. §§1512(c)(2) and 2, Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. §1752(a)(1), Disorderly and Disruptive Conduct in a Restricted Building of Grounds, in violation of 18 U.S.C. §1752(a)(2), Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. §5104(e)(2)(D), and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. §5104(e)(2)(G). For the reasons that follow, Mr. Weeks is recommending a sentence of three (3) years probation, with the first twelve (12) months to be served

on home detention.

## II.   <u>History and Characteristics of Mr. Weeks</u>

Bradley Weeks is a forty-five (45) year old man, born and raised in Clay County, Florida. He grew up on a rural tree farm that his family owned. Mr. Weeks graduated from Clay High School in 1996, after which he attended St. Johns River Community College, with a full scholarship, and graduated in 1998 with an Associates of Arts degree in Graphic Design. That year Mr. Weeks also earned his Associate of Science from Florida State School of Arts. Thereafter, he began attending the University of North Florida but was not able to continue and obtain his bachelor's degree as he got married and had his first child in 2001. Mr. Weeks then briefly worked as a mapper and estimator for C&J Utilities, in Clay County, Florida.

Mr. Weeks' faith is and has been one of the pillars of his life. Moreover, art is one of the passions of his life, particularly music and photography, and this led him to use his vocal talents as a singer, and later a photographer and graphic designer. As a young man Mr. Weeks sang in a family gospel band called "the Weeks Family Singers" as a hobby. This experience led him to pursue a career singing in a Gospel group called "Proclamation," which he formed with his two cousins. Mr. Weeks then joined a Christian quartet called "The Accords" that traveled around the Southeast performing. Ultimately, he was offered a fulltime position singing with a professional Gospel Quartet called "The Anchormen" in North Carolina.

Photographs of Mr. Weeks' gospel career are attached hereto as Composite Exhibit 1.

When his first wife became pregnant with the couple's second child, however, Mr. Weeks returned home to be near his family and began working as a graphic designer for Bryant Design. He now owns his own business called "Photo Finish" where he provides photography and graphic design services to various clients, including wedding, prom and graduation photo shoots.

Sadly, Mr. Weeks' first marriage ended in divorce in 2009, but both Mr. Weeks and his ex-wife amicably co-parent their two children who are now twenty-two (22) and eighteen (18) years old. Mr. Weeks married his current wife, Daphne Weeks, in 2013, providing a loving home for his blended family. The Weeks family live a simple, country, Christian lifestyle. Photographs of Mr. Weeks and his family are attached hereto as Composite Exhibit 2.

Mr. Weeks has successfully raised his own children with his ex-wife, while also effectively stepping in as a father to Daphne's children, his stepchildren. After Mrs. Daphne Weeks's divorce from her first husband, he ceased contact with their two children. As a result, Mr. Weeks has been the only father figure to his stepchildren, raising them as his own. Daphne Weeks suffered a stroke in 2012, after which, her first husband stopped paying child support all together. At this point in 2012, Daphne and Mr. Weeks were only dating but, despite this, Mr. Weeks stepped

in fully to support Daphne's children emotionally, mentally, and financially, as well as caring for Daphne. Mr. Weeks helped to pay for Daphne's eldest son's college in Pensacola, Florida. Mr. Weeks took the family on vacations, and even built a "Mother-In-Law-Suite" in the back of the couple's home so their children could have their own space but still be close during their college years.

All four of Mr. Weeks' children are successful in their own right. Mr. Weeks' son is attending University of North Florida, and also works part-time at a local Budweiser brewery. Mr. Weeks' stepson is a youth pastor and a teacher at the local high school that Mr. Weeks' daughter attended. Mr. Weeks' daughter was on the A-Honor Roll and his son earned high honors at this school before they graduated. Mr. Weeks' stepdaughter works as an accountant for a equipment manufacturer for first responders in Kentucky and just recently gave birth to his first grandchild.

Mrs. Daphne Weeks has had serious health issues for the majority of her life, continuing today. Mrs. Weeks was diagnosed with Chronic Migraines and a spinal fluid leakage at the age of 16. The next year she was pregnant with her son and had to have an emergency cesarean section because of preeclampsia. The preeclampsia was just the beginning of her life altering struggle with high blood pressure. Mrs. Weeks also struggled with her reproductive system, undergoing multiple procedures for endometriosis, a tubal and full hysterectomy, all within seven years. In 2010, she was in a car accident where she sustained a sprained neck and was required to wear

a brace. This injury caused bilateral neuropathy in her upper extremities, and she still experiences the side effects of this to this day, such as weakness and numbness.

In 2012, Mrs. Weeks had a Cerebral Vascular Accident, a stroke that is caused by a blood clot. This stroke caused permanent peripheral blindness and partial forward blindness in her right eye. Moreover, she became at risk for falls, due to weakness in the right side of her body. Mrs. Weeks was told during hospitalization for the stroke that she might never walk again and was in a wheelchair for a period of time before being able to walk with a cane. She still has the cane to this day and uses it occasionally as needed unless Mr. Weeks is there to act as her support.

During this hospital stay she was diagnosed with a patent foramen ovale (PFO), which is a hole in the central valve of her heart. She was also diagnosed with Factor V Leiden, which is a clotting disorder that leads to a very high risk of blood clots, which in turn can cause further strokes. This disorder paired with the PFO is a lethal cocktail of health problems, because if the hole in her heart opens at the wrong time, a blood clot can enter through it and cause another stroke. Mrs. Weeks was on a regimen of prescription blood thinners but was finally able to ween off of them where she now takes 325 milligrams of Aspirin once a day to thin her blood. Due to the severity of her condition, her doctor recommends that she never miss a day of taking this Aspirin and, if she needs to have a procedure done that would require her to stop taking Aspirin, she has to get consent from her doctor first. Mrs. Weeks also

has celiac disease, arthritis, fibromyalgia and "long haul" COVID.

As stated above, Mr. Weeks began caring for Mrs. Weeks in 2012. Due to the blindness in Mrs. Weeks right eye, Mr. Weeks walks on her right side to help guide her. Mrs. Weeks is unable to feel the bottoms of her feet, causing her to misstep or make mistakes while walking. Since Ms. Weeks' right side remains weak from her prior stroke, her husband always walks on her right side to prevent unexpected falls.

Mrs. Weeks has a pattern of immediate and sudden migraines upon waking up and, as a result, Mr. Weeks attempts to give his wife the time to wake up slowly. On a good day, Mrs. Weeks is able to get herself out of bed, dress herself, take her medicine, and go about her day. But on a bad day, because she is unable to do so herself, Mr. Weeks has to provide extensive assistance to get her out their bed, help her get dressed and ready her in the morning.

When the Weeks family leaves their trailer, Mr. Weeks helps Mrs. Weeks into their truck. Moreover, when they walk anywhere, he has to assist her at all times. He is her eyes, her feet, and her balance. This routine and pattern have become essential to their daily lives. They both work from home, and this allows Mr. Weeks to fulfill his role more fully as Mrs. Weeks care provider. When they do have to travel for work, Mr. Weeks takes Mrs. Weeks with him. Mr. Weeks fears being separated from his wife even for short periods of time. Given the gravity of Mrs. Weeks' condition, she struggles with depression for which Mr. Weeks provides emotional support in

managing her depression. Alongside all of this, Mr. Weeks has his own health concerns, the most serious being his history of a cervical spinal fusion resulting from a car accident. Nevertheless, he still serves as the main provider and caregiver for his wife.

Because of her right-side weakness, bilateral neuropathy, not being able to feel the bottoms of her feet, partial blindness, and overall health condition, there are many household chores that Mrs. Weeks cannot do alone, so Mr. Weeks is primarily responsible for the household labor. Mr. Weeks' participation in the events of January 6, 2021, and the resulting prosecution of him caused the Weeks to sell their family home. They now live in a camper that is located on his grandparents' property.

Mr. Weeks's family live in Macclenny, a small community in Baker County, Florida, where they have played a large role in the local and surrounding area. His family members often served their local community through civic engagement, such as serving as members of the local school board, property appraiser, and tax collector. From an early age, this taught Mr. Weeks the importance of serving your community and Mr. Weeks frequently donates his time and resources to charitable events within the community. Mr. Weeks is loved by all who know him, as attested to in letters of support for him, attached hereto as Composite Exhibit 3.

### III.   <u>Offense Conduct</u>

On January 5th, 2021, Mr. Bradley Weeks traveled to Washington, D.C., in response to then President Trump's call to his supporters to show up to attend his "Stop the Steal" rally. Mr. Weeks could not foresee the events that would take place, nor could he predict the high emotions that would sweep him away and cause him to forget reason and his better judgment.

As is clear from the evidence at trial, Mr. Weeks was a passionate supporter of President Trump. After the election, when Mr. Trump asked his supporters to join him in Washington, D.C., on January 6, 2021, Mr. Weeks, like the thousands of other Trump supporters, heeded the call. On January 5, 2021, Mr. Weeks along with his Co-Defendant, Daniel Carlton, traveled together to Washington D.C. to attend the "Stop the Steal" rally. Mr. Weeks did not attend as a member of any larger organization, but rather as an individual participant alongside Mr. Carlton.

As history documents, former President Trump gave a harrowing and provocative speech at the "Stop the Steal" rally, making such statements as:

> We will never give up; we will never concede. It doesn't happen. You don't concede when there's theft involved. Our country has had enough. We will not take it anymore and that's what this is all about. And to use a favorite term that all of you people really came up with: We will stop the steal…. Nobody knows what the hell is going on. There's never been anything like this. We will not let them silence your voices. We're not going to let it happen, I'm not going to let it happen.

8

After these statements, the audience chanted, "fight for Trump," over and over.

The former President continued:

> We're gathered together in the heart of our nation's capital for one very, very basic and simple reason: To save our democracy…. They've turned a blind eye, even as Democrats enacted policies that chipped away our jobs, weakened our military, threw open our borders and put America last…. Because you'll never take back our country with weakness. You have to show strength and you have to be strong. We have come to demand that Congress do the right thing and only count the electors who have been lawfully slated, lawfully slated. I know that everyone here will soon be marching over to the Capitol building to peacefully and patriotically make your voices heard.

The former President continued to make inflammatory statements that served to incite the crowd further. He railed about "Big Tech," indoctrinating children in schools and the overall "assault" on democracy. Trump went on to tell the crowd that it was a "testament" to standing up to that assault:

> And we fight. We fight like hell. And if you don't fight like hell, you're not going to have a country anymore. Our exciting adventures and boldest endeavors have not yet begun. My fellow Americans, for our movement, for our children, and for our beloved country. And I say this despite all that's happened. The best is yet to come.

Mr. Trump told his supporters to march down Pennsylvania Avenue to the Capitol Building. Mr. Weeks and his companion, like the multitudes of other Trump supporters, heeded that call.

Being a photographer and videographer, Mr. Weeks filmed a large portion of his day's activities, including the rally at the ellipse, the walk down Pennsylvania Avenue to the Capitol and some of the activity outside of the Capitol. Once a group of protestors broke through the police barricade on the stairs of the Capitol, causing the law enforcement officers to retreat back up to the Upper West Terrace, Mr. Weeks walked up there as well. Rather than joining others who were intent on violently entering the building, Mr. Weeks stepped to the northwest corner on the Upper West Terrace and began to film the crowd below, as well as himself giving an impassioned narrative of what was unfolding that afternoon. Mr. Weeks, like the individuals and groups around him, was caught up in the shared, herd mentality and emotions of the moment. His video consists of the hyperbole demonstrated in tweets, other social media posts, videos and similar "speeches" and material from that day, both from violent and non-violent participants of the events at the Capitol. This video was taken prior to his non-violent entry into the Capitol building.

Mr. Weeks did not enter the Capitol building until after the members of Congress were removed. In fact, Mr. Weeks never intended to enter the Capitol building, and only did so upon learning that his friend, companion, and now Co-Defendant, Daniel Carlton, became injured inside. Mr. Carlton texted Mr. Weeks that he had sustained leg injuries. A copy of this text exchange and the closed circuit camera footage (CCTV) introduced at trial is attached hereto as Exhibit 4 (Trial

Exhibit 1.69). It is clear from this text exchange that Mr. Weeks entered the Capitol building twenty-one (21) minutes after Mr. Carlton's entry with the intention of assisting his injured friend.

The CCTV videos introduced at trial show Mr. Weeks walking around inside the Capitol, amongst a large crowd of people, and then exiting the building. Mr. Weeks was in the building for approximately 20 minutes. Mr. Weeks did not use any force to enter the Capitol building, nor was he a part of any initial breach of it, whereas his companion, Mr. Carlton, appeared to be one of the first to break through the doorway during the second breach of the Senate Wing door. In fact, Mr. Carlton's injury was sustained as he entered through the Senate Wing door, falling over furniture used to barricade the door. Despite this critical fact, Mr. Carlton was charged only with misdemeanor offenses, for which he pled to one count of Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. §5104(e)(2)(G) and received three (3) years' probation.

Reviewing the evidence at trial is quite illuminating as it establishes the relative conduct of these two individuals. Mr. Carlton willfully, knowingly, and intentionally made his way to the front of the crowd and was one of the first people to enter through the Senate Wing door on its second breach. Click Here to Watch CCTV Footage of Danny Carlton Entering the Senate Wing Door (Trial Exhibit 2.23 Time 5:00 Minutes Long). In contrast, Mr. Weeks stayed on the outside, videotaping

and photographing the scene. It was not until Mr. Carlton texted Mr. Weeks that he was injured did Mr. Weeks enter the building. Mr. Weeks found his friend and the two walked through the Capitol, attempting to leave through the South exit but were redirected the other way due to another individual attempting to re-enter the building through that door. Click Here to View Law Enforcement Directing Mr. Weeks and Mr. Carlton to Turn Back (Trial Exhibit 2.13 Time 3:00 Minutes Long).

While in the building Mr. Weeks did not threaten or assault anyone, including law enforcement officers, did not damage or take any property, did not enter any offices or either chamber of Congress. Mr. Weeks entered through the Senate Wing door, along with throngs of others who were at that time freely flowing into the building, found his companion and the two walked through the building trying to exit the South door before complying with officers orders to turn around due to a use of force incident with someone not affiliated with them trying to re-enter the building. Thereafter, Mr. Weeks returned on the path he had taken and exited the building without incident.

Mr. Weeks is remorseful for his role in what unfolded on January 6, 2021. Perhaps the best evidence of that is what he told Federal Bureau of Investigation (FBI) Special Agent Joshua McLeod when he was interviewed following his arrest on January 21, 2021, twenty days after the event: "I did not go up there for violence and I got sucked into something I wish I hadn't of (sic). I regret that." Special Agent

12

McLeod believed Mr. Weeks' remorse to be genuine, writing in his Report of Investigation (302) of Mr. Weeks' interview: "[t]hroughout the duration of the interview, WEEKS was cooperative with the interviewing Agent and Task Force Officer. WEEKS expressed remorse for what transpired and indicated that that was never his intent. WEEKS accepted responsibility for his actions." *See* Agent McLeod's Report of Investigation (302), for investigation on 01/21/2021, at p. 3, attached hereto as Exhibit 5. Like many others present that day, Mr. Weeks allowed his emotions to overcome his better judgment.

Following his arrest and prosecution, Mr. Weeks received threats for his involvement in the events of the day. Attached hereto as Composite Exhibit 6 are threatening letters received by Mr. Weeks following his arrest. Mr. Weeks' involvement in the events of January 6, 2021, his resulting arrest, prosecution and conviction, and the uncertainty of his future have caused him, as well as his family, great stress and anxiety over the past two plus years.

### IV.    Relevant Sentencing Factors under 18 U.S.C. §3553

The Pre-Sentence Investigation Report (PSR) calculates Mr. Weeks' Sentencing Guidelines as a Criminal History Category I and a Total Offense Level of 17, resulting in a recommended range of imprisonment of 24-30 months. Mr. Weeks respectfully asks this Court to grant a downward variance[1] and sentence Mr.

---

[1] By separate motion, Mr. Weeks is seeking a downward departure for Acceptance of

Weeks to three (3) years probation, with the first twelve (12) months on home detention.

In seeking home detention, counsel for Mr. Weeks in no way intends to diminish Mr. Weeks actions or the severity of incidents that took place on January 6th. Mr. Weeks' particular actions, however, when considered in the totality of the circumstances of events occurring that day, his individual history and characteristics, as well as the sentence imposed on his far more culpable co-defendant, collectively establish that a sentence of home detention and probation is appropriate in this case. Indeed, such sentence would meet the objectives of sentencing without being overly punitive, and would provide adequate deterrence for Mr. Weeks, while simultaneously avoiding an unwarranted sentencing disparity with his Co-Defendant, Mr. Carlton, and the other January 6th defendants.

In *United States v. Booker,* 543 U.S. 220 (2005), the Supreme Court held that the provisions of the Sentencing Guidelines were not to be applied in such a way as to be mandatory, but rather to be applied in an advisory fashion. "The district courts, while not bound to apply the Guidelines must consult those Guidelines and take them into account when sentencing." *Id.* at 264. After calculating the Guideline range, the court may impose a more severe or more lenient sentence. Under *Booker,* sentencing courts treat the sentencing guidelines as just one of a number of sentencing factors

---

Responsibility under USSG §3E1.1.

set forth in 18 U.S.C. §3553(a). Moreover, §3553(a) directs the court to look at every defendant and their actions on an individual basis.[2] The primary intent of §3553(a) is to impose a sentence that is "sufficient, but not greater than necessary" to accomplish the purposes of sentencing. Such purposes can be achieved by a term of three (3) years probation, with the first twelve (12) months on home detention.

## V.    The Need to Avoid Unwarranted Sentencing Disparities and Cases Similar to That of Mr. Weeks

The Government has laid out in prior sentencing memorandums several factors it believes to be relevant in sentencing the individuals charged as the result of their participation in the events of January 6, 2021. These factors include: (1) whether, when, how the defendant entered the Capitol Building; (2) whether the defendant engaged in any violence or incited violence; (3) whether the defendant engaged in any acts of destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with or ignored law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition.

Almost all of these factors weigh in favor of this Court varying downward

---

[2] *See Kimbrough v. United States*, 552 U.S. 85, 90 (2007); *Gall v. United States*, 552 U.S. 38 (2007).

from the recommended guideline sentence. As detailed above, the evidence shows Mr. Weeks entered the building through an already open door and remained solely on the ground level of the Capitol for a brief time, a total of twenty-one (21) minutes. Mr. Weeks did not engage in any violence or destruction of property, nor did he encourage others to engage in violent behavior or destruction of property. In terms of Mr. Weeks' reaction to acts of violence, Mr. Weeks complied with law enforcement officers to turn around when attempting to exit the South door upon the officers' use of force upon another individual attempting to enter through that door. Mr. Weeks destroyed no evidence, and, indeed, he consented to the seizure and search of his cell phone upon his arrest. Mr. Weeks was in the Capitol building for approximately 20 minutes and his actions, or lack thereof, are chronicled above. As stated above, Mr. Weeks cooperated with law enforcement and expressed remorse for his conduct when interviewed.

Click Here to View Portions of Mr. Weeks' Interview With Investigating FBI Agent (Time: 1:55 Minutes Long).

Many of the sentences imposed by the judges of this district related to charges of Obstruction of an Official Proceeding, in violation of 18 U.S.C. §1512(c)(2), and a majority of these cases received substantial downward variances. Undersigned counsel is in no way minimizing Mr. Weeks' behavior. To the contrary, since his initial contact with law enforcement, Mr. Weeks has been forthright and remorseful.

16

Nonetheless, it is necessary to compare Mr. Weeks' conduct with the conduct and sentences of other similarly convicted defendants. Undersigned counsel recognizes that in light of the sheer magnitude of January 6th cases, it is likely that the District Court judges are attempting to achieve some degree of uniformity amongst the various sentences imposed. As a result, an examination of other similar cases in which defendants were convicted of the §1512(c)(2) offense offers this Court guidance in fashioning an appropriate sentence.

As previously discussed, the Government asked for 3 months' incarceration, and 36 months' supervised release for Mr. Weeks' Co-Defendant, Jonathan Daniel Carlton, following his plea to one count of Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. §5104(e)(2)(G). The Court granted a substantial downward variance and sentenced Mr. Carlton to a term of 36 months' probation, 40 hours of community service and $500 in restitution. An examination of Mr. Carlton's conduct shows that his conduct was far more serious than that for which Mr. Weeks is to be sentenced. Around 2:48 p.m., Mr. Carlton went towards the Senate Wing Door, joining the throng of people attempting to enter. Mr. Carlton entered the Capitol with the large crowd. Trial Exhibit 2.23 shows that Mr. Carlton was one of the first people to enter the Capitol doors at that location upon the second breach of the Senate Wing Door.

It was during this entry that Mr. Carlton injured his leg and was trampled by the people around him. Mr. Carlton then began attempting to meet up with Mr. Weeks, who had remained outside the building up until this point. *See* Exhibit 4 (Trial Exhibit 1.69). Mr. Carlton texted Mr. Weeks, that he (Mr. Carlton) was inside the Capitol, near the window that "we breached" and was "burning up with leg injuries." It was only then that Mr. Weeks entered into the Capitol building, twenty-one (21) minutes later, to assist Carlton.

At the time Mr. Weeks entered through the Senate Wing door, a crowd was steadily flowing into the building unimpeded. Upon entering through the door, Mr. Weeks and Mr. Carlton were initially unable to find one another in the crowd and were ultimately able to locate one another just inside the entrance. After reuniting, the two attempted to leave through the south door, after traveling through the Crypt. However, they were unable to access the South Door exit, because an altercation had ensued between law enforcement officers and a protestor. Mr. Weeks and Mr. Carlton were directed by law enforcement to go back the way they came, an order with which the two men complied, as they turned around and walked back to the door through which they entered. *See* Trial Exhibit 2.13.[3]

---

[3] Additionally, it should be noted that, unlike Mr. Weeks, Mr. Carlton was less than cooperative with law enforcement officers. Upon being contacted by law enforcement officers about his involvement in the events of January 6, 2021, Mr. Carlton lied and denied going into the Capitol. (Dkt. 1 at p.2). He also falsely asserted after being arrested that he was forced/pushed into the Capitol. *Id.* at p.3. Lastly, Mr. Carlton wiped his phone after being contacted by law enforcement officers.

In the case of *United States v. Paul Hodgkins*, Case No.: 21-cr-188-RDM, the Government recommended a sentence of 18 months' incarceration, but the court granted a substantial downward variance and imposed 8 months incarceration, with 24 months of supervised release, and $2,000 in restitution. (Dkt. 37, p. 2). Mr. Hodgkins was seen in the well of the Senate Chamber, and is documented by multiple photographs in the room at the time. (Dkt. 1, p. 2, ¶¶8-9, p. 3, ¶11).

In the case, *United States v. Richard Michetti*, Case No.: 21-cr-232-CRC, the Government sought 18 months incarceration, 36 months supervised release, and $2,000 restitution. However, the court granted a downward variance and imposed 9 months incarceration, 24 months supervised release, and $2,000 in restitution. Mr. Michetti described his experience at the Capitol in texts, stating "it's going down here we stormed the building they held us back with spray and tear gas and paintballs." (Dkt. 1, p. 3). He also texted saying "Gotta stop the vote, it's fraud this is our country[,]" and "my eyes are [burning]," as well as "thousands of people are storming." (*Id.*) He also sent two videos over text that he himself filmed, of other rioters inside the Capitol Building, as well as a video of an interior room of the Capitol Building where there were numerous protestors carrying various flags and walking around yelling. (*Id.*)

At approximately 4:20 p.m., Michetti sent a series of texts to an FBI witness with whom Mr. Michetti had been romantically involved, stating: "If you can't see

the election was stolen you're a moron," and "This is our country do you think we live like kings because no one sacrificed anything?" (*Id.*) He continued, stating "[…]the vote was fraud and trump won but they won't audit the votes. We are patriots we are not revolutionaries[,] the other side is revolutionaries they want to destroy this country and they say it openly. When the left banged on the doors of congress when they congratulated Brett Kavanaugh no one touched not one of them. We were outside and they were shooting tear gas and pepper spray […] they were shooting and throwing tear gas before we even were near the building. It's public property." (*Id.*)

Around 6:00 p.m., Mr. Michetti sent another series of texts to the same witness as before. (*Id.*) These texts stated "I understand your point but what I am saying is [Witness's Name] the election was rigged[,] and everyone knows it. All's we wanted was an investigation, that's it. And they couldn't investigate the biggest presidential race in history with mail in ballots who everyone knows is easy to fraud"; (*Id.* at p. 4). "This is tyranny they say there and told us 'we rigged the election and there's nuthin you can do about it' what do you think should be done?" (*Id.*) These texts were provided to the FBI by this Witness, alongside photographs sent from Michetti. (*Id.*)

In the case of *United States v. Matthew Bledsoe*, Case No.: 1:21-cr-00204-BAH-1, the Government recommended 70 months incarceration, with 36 months

supervised release, and $2,000 in restitution. The court granted Mr. Bledsoe a downward variance and imposed 48 months incarceration, 36 months supervised release with a $2,000 fine and $2,000 in restitution. Mr. Bledsoe also had a significant social media presence. (Dkt. 1, p. 2). He posted many pictures and videos of people scaling the walls of the Capitol building, with phrases like "Nothing can stop whats coming," as well as self-styled photos of him in front of the Capitol building. (*Id.*) In one of the videos that Mr. Bledsoe posted, he and his companions are outside of one of the doors into the Capitol building and an alarm can be heard blaring in the background. (*Id.*) Mr. Bledsoe's companion says, "We are going in!" and Mr. Bledsoe turns the camera to show the door. (*Id.*) He then says, while walking through the door "In the Capitol. This is our house. We pay for this shit. Where's those pieces of shit at?" (*Id.*)

In the case of *United States v. John Strand*, Case No.: 1:21-cr-00085-CRC-1, the Government recommended 78 months incarceration, with 36 months supervised release, and $2,000 in restitution. The Court granted a downward variance and imposed 32 months incarceration, 36 months on supervised release and $2,000 in restitution. Mr. Strand is a well-known social media personality and model. Mr. Strand posted heavily to social media about his political beliefs and about the event itself. (Dkt. 1 p. 5 ¶ 15). He was seen in multiple videos taken by other individuals and captured on surveillance footage. (*Id.* at p. 7 ¶ 20). In one particular video, Mr.

Strand and his companion are attempting to push past multiple officers blocking the entrance to the Capitol. (*Id.* at p. 8 ¶21). One of these officers, who had been pinned near the doors to the Capitol, seems to be pulled down by someone in the crowd and lands near Mr. Strand. (*Id.*)

In the case of *United States v. Edward Vallejo*, Case No.: 1:22-cr-00015-APM-11, the Government recommended 204 months incarceration, however, the Court granted a substantial downward variance and imposed 36 months incarceration, 36 months of supervised release, with the first 12 months on home detention. Mr. Vallejo was part of the Oath Keepers, a far-right extremist organization. (Dkt. 1, p. 5 ¶ 12). Mr. Vallejo coordinated what the Oath Keepers called its "Quick Reaction Force" or QRF groups. (*Id.*) These teams were prepared in order to rapidly transport firearms and other assorted weapons into Washington D.C. in order to support using force to prevent the transfer of presidential power. (*Id.*)

In the case of *United States v. Pauline Bauer*, Case No.: 1:21-cr-00386-TNM-2, the Government recommended 78 months incarceration, 36 months' supervised release, and $2,000 in restitution. The Court granted a downward variance and imposed 27 months incarceration, 24 months supervised release and $2,000 in restitution. Ms. Bauer entered the Capitol Building, pushing past law enforcement officers to get through the east Rotunda door and into the Rotunda area. (Dkt 1-1 p.

9). There is also video footage of Ms. Bauer being involved in a skirmish with law enforcement. (*Id.*) Moreover, body-camera videos that were recorded show Ms. Bauer saying, in reference to Nancy Pelosi, "Bring that fucking bitch out here now. Bring her out. Bring her out here. We're coming in if you don't bring her out. [] They need to hang… Bring her out." (*Id.* at p. 12). Ms. Bauer's numerous Facebook posts and comments on the event, using similar rhetoric, talking about "taking [their] country back from communism," posting pictures of her at the Capitol and being "tagged" in pictures at in the Capitol. (*Id.* at p. 3-4).

In the case of *United States v. Katharine Morrison*, Case No.: 1:21-cr-00334-TJK-3, the Government recommended 18 months incarceration, 36 months supervised release, and $2,000 in restitution. The court granted a downward variance and imposed 8 months incarceration, 24 months supervised release with the first 8 months on home detention. Ms. Morrison entered into the Capitol Building and went into various areas within the building, including the Crypt, the Speaker of the House's Suite, the Rotunda, and the Senate Chamber. (Dkt. 75 p. 6 ¶ 10). While in the Senate Chamber, Mr. Morrison looked through the Senators' desks, and took photographs of the documents that were in and on those desks. (*Id.* at ¶11).

In the case of *United States v. Tara Aileen Stottlemyer*, Case No.: 1:21-cr-00334-TJK-2, the Government recommended 18 months incarceration, 36 months supervised release and $2,000 in restitution. The court granted a downward variance

and imposed 8 months incarceration, 24 months' supervised release, with the first 8 months on home detention. Ms. Stottlemyer was on the West Front grounds of the Capitol, when Mr. Shalvey, her companion, walked up to a bike rack used as a barricade to prevent protesters from accessing the Capitol, and picked up an object, and threw that object at a law enforcement officer. (Dkt. 74, p. 4 ¶ 10) Ms. Stottlemyer witnessed the incident, before they both retreated into a crowd of protestors. (*Id.*) Ms. Stottlemyer along with her companions breached the Capitol Building through the Senate Wing door, and then going through the Crypt, the Speaker of the House's Suite, the Rotunda, and the Senate Chamber. (*Id.* at ¶ 11). Ms. Stottlemyer, along with her companions, entered into the Senate Chambers and took photographs of documents that were inside and on Senators' desks. (*Id.*)

During the height of the election season, Mr. Weeks, like many others, became a heavy participant on social media. His Facebook group, "Fraud 2020" had about 15,000 followers. When Mr. Weeks went to Washington, D.C., to attend the "Stop the Steal" rally, along with many others, he went to protest and exercise his political beliefs. At the behest of former President Trump, Mr. Weeks, alongside others, marched to the Capitol building. Before entering the Capitol Building, Mr. Weeks, impassioned by the sight of what he thought to be so many likeminded individuals in one place, recorded a video as he was caught up in the moment. This was before Mr. Weeks realized the consequences of his individual actions in the collective and

has since expressed his contrition.

Mr. Weeks then entered into the Capitol Building on the ground floor, through a set of doors that had been breached approximately twenty minutes earlier. Mr. Weeks did not breach these doors himself, nor did he use any force to enter through these doors. Mr. Weeks and Mr. Carlton found each other around one minute after Mr. Weeks entered the building and are seen walking through the Crypt at 3:09 pm, attempting to exit through the South Door at the end of the Hall of Columns, to which they arrived at 3:11 pm. It was during this time that Mr. Weeks and Mr. Carlton were directed back the way they came and Mr. Weeks and Mr. Carlton readily complied without protest. At 3:14 pm, Mr. Carlton and Mr. Weeks left the Hall of Columns. After using the restroom, they left without incident. Mr. Weeks was in the Capitol Building for approximately twenty-one (21) minutes.

Unlike many of the above listed defendants, Mr. Weeks was never in the Senate Well, in Congresspersons' offices, or embroiled in physical altercations with police officers. He was not one of the first to breach one of the Capitol Building entrances, nor did he enter the building using force. He did not come to the Capitol with any far-right, terrorist organizations. He did not go through the desks nor take pictures of the contents of those desks. Mr. Weeks did not steal, destroy or otherwise damage any property. While Mr. Weeks did have a large social media presence, unlike many of the above listed defendants he did not call for violence nor did he

make attempts to incite others to violence. Indeed, after the day's events, he stopped posting to social media anything related to politics or the events of the day.

Defendants in the above mentioned cases, charged with the same offense received substantial downward variances. One defendant, an Oath Keeper, Edward Vallejo, received a 168 months' downward variance. Others, like Pauline Bauer, received as much as 51 months' downward variance. Katharine Morrison and Tara Stottlemyer, received as much as a 10 months' downward variance.

## VI.   Conclusion

For all the foregoing reasons, Mr. Weeks respectfully requests this Court to exercise its discretion to grant him a downward variance from his guideline range of punishment and sentence him to three (3) years probation, with the first twelve (12) months of be served on home detention.

Respectfully submitted,

_Matthew R. Kachergus, Esquire_
Florida Bar No.:  503282
Elizabeth L. White, Esquire
Florida Bar No.:  314560
Bryan E. DeMaggio, Esquire
Florida Bar No.:  055712
Camille E. Sheppard, Esquire
Florida Bar No.: 124518
Sheppard, White, Kachergus, & DeMaggio, P.A.
215 Washington Street
Jacksonville, Florida 32202
Telephone: (904) 356-9661
Facsimile: (904) 356-9667
Email: sheplaw@sheppardwhite.com
COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on August 7, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

**Jamie Carter, Assistant U.S. Attorney**
**Kathryn E. Fifield, Trial Attorney**
**U.S. Department of Justice**
**U.S. Attorney's Office for the District of Columbia**
**555 Fourth Street, NW**
**Washington, DC 20530**

ATTORNEY